FILED

2005 Oct-26  AM 10:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| PORTIA WYNN, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-03-S-2548-NE |
| | ) | |
| DAIKIN AMERICA, INC., a foreign | ) | |
| corporation, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Portia Wynn ("plaintiff" or "Wynn"), is a former employee of defendant, Daikin America, Inc.   She claims that defendant terminated her employment because of her race (African American), and that she was subjected to a racially hostile work environment.[1]   Her claims are based upon 42 U.S.C. § 1981. The action presently is before the court on defendant's motions to strike,[2] and for summary judgment.[3]   Upon consideration of the motion for summary judgment, plaintiff's response,[4] defendant's reply,[5] and the parties' evidentiary submissions,[6] the

---

[1] *See* doc. no. 1 (Complaint).

[2] Doc. no. 16.

[3] Doc. no. 9.

[4] Doc. no. 13.

[5] Doc. no. 18.

[6] Doc. no. 11 (defendant's evidentiary submission); doc. no. 14 (plaintiff's evidentiary submission); doc. no. 18 (defendant's supplemental evidentiary submission), appended to defendant's reply brief.

court concludes the motion should be granted.   Defendant's motion to strike accordingly will be denied as moot.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

## II.  SUMMARY OF FACTS

Daikin America, Inc. ("DAI" or "defendant") manufactures fluorochemical products, including gas products, liquid products, and plastic powders, at its facility in Decatur, Alabama.[7]  DAI has several policies which are relevant to this case.  First, DAI maintains an "at-will" employment relationship with its employees, reserving "the right to terminate [an employee's employment] at any time without cause or prior notice."[8]

DAI also has a policy prohibiting "any harassment based on race, sex, color, religion, national origin, veteran past military service status, reservist status, or lawful alien status, age or disability."[9]  The policy directs an employee who has been harassed to submit a confidential written complaint to the Human Resources Manager, who investigates the charge.[10]  An employee found guilty of violating the

---

[7] Doc. no. 11 (defendant's evidentiary submission), Tab 1 (Affidavit of Forrest Keith), at ¶ 3.

[8] Doc. no. 14 (plaintiff's evidentiary submission), Tab E (DAI Employee Handbook dated June 1, 2001), at § 1-4.  *See also id.* at § 6-9 ("If DAI determines that you fail to meet these expectations and standards of performance, or if DAI determines that you are guilty of misconduct warranting dismissal, you  may be dismissed.  Should you be dismissed under these circumstances, no notice may be given . . . .").

[9] *Id.* at § 2-1.

[10] *Id.*

harassment policy is "subject to disciplinary action up to and including immediate discharge even for a first time offense."[11]

Furthermore, DAI has a policy governing other types of employee complaints, including those *not* arising out of harassment.  That policy states:

> If you have a complaint or work-related problem, or if you feel you are not being treated fairly, DAI encourages you to talk to us about it.  We want to work with you in solving any problem that might arise.  First, discuss the problem with your immediate supervisor.  If you are not satisfied with the answer you receive, we want you to discuss it with your manager.  If the manager believes that further discussion is needed, he/she will arrange for you to meet with the Human Resources Manager.  If a solution still cannot be reached, a meeting with the Plant Manager will be arranged.  Most problems can be settled by an examination and open discussion of all the facts.  If your concern involves the harassment policy, then as explained in Section 2-1, you have the option of going directly to the Human Resources Manager.  Management is sincerely interested in your problems because we believe they are also our problems.  Your problems will be given prompt attention.[12]

Moreover, DAI requires its employees to adhere to certain rules of conduct for the purpose of "maintain[ing] a safe, healthy, and efficient operation."[13]  These rules prohibit, among other things:

1.   Violation or disregard of basic DAI policy or procedure, basic safety rules and safe working practices, including carelessness towards the safety of fellow employees or oneself[;]

---

[11] *Id.*

[12] *Id.* at § 6-1.

[13] *Id.* at § 6-10.

. . . .

6.      Sleeping on duty[;]

. . . .

10.     Intentional falsification of employee or DAI records[;]

. . . .

13.     Smoking, tobacco use, eating and/or drinking in any area of the premises that has not been designated an approved eating, drinking, or smoking location[;]

. . . .

24.     The making or publishing of false, vicious, or malicious statements concerning any employee, supervisor, DAI or its products[; and]

. . . .

30.     Violating a security procedure.[14]

Any employee who is determined to have engaged in the prohibited conduct "is subject to immediate removal from the premises and immediate corrective action up to and including discharge. The extent of corrective action will be determined by DAI's judgment regarding seriousness and/or frequency of the act, the individual's total work record, and all pertinent facts in the case."[15]

---

[14] *Id.* at § 6-10.

[15] *Id.*

Finally, DAI has a safety policy.  "Each employee is responsible for strict adherence to all safety and health rules established by DAI, including but not limited to those rules and regulations established which conform to the provisions of the Occupational Safety and Health Act (OSHA)."[16]  DAI states that the safety policy includes a prohibition against using any cellular telephone that has not been certified as "intrinsically safe" by OSHA.[17]  DAI also states that no one other than Shift Supervisors has possessed a cell phone which satisfies the company's "intrinsically safe" standard.[18]  Plaintiff states she was not aware of any policy prohibiting or limiting cell phone use, and that she never received any training on such a policy.[19]

## A.   Plaintiff's Employment History

Plaintiff began working for DAI in June of 1993, when she was hired by Human Resources Manager Forrest Keith.[20]  She initially held the position of an Operator in the F-1 Finishing Department,[21] a production area where liquid chemical polymer is converted into powder form.[22]  Plaintiff's duties as an F-1 Finishing

---

[16] *Id.* at § 7-1.

[17] *See* Keith Affidavit, at ¶¶ 3(c), 21(b)(3)(b); *see id.,* Exhibit H, at ¶ 35 ("Pagers, 2-way radios, cellular phones and any other electronic devices brought on site shall be intrinsically safe unless exempted by plant safety.").

[18] *See* Keith Affidavit, at ¶ 21(b)(3)(b).

[19] *See* plaintiff's evidentiary submission, Tab G (Deposition of Portia Wynn), at 95-96.

[20] *Id.* at 45; Keith Affidavit, at ¶ 4.

[21] Keith Affidavit, at ¶¶ 5-6.

[22] *Id.* at ¶ 5(a).

Operator included

> working around moving machinery in the clean room, packaging
> polymer powder product, processing powder onto drying racks, loading
> and unloading room-sized drying devices using a forklift, setting parts
> of the production process cycle using computer controls, adding the
> appropriate mixture of nitric acid and other materials to the coagulation
> vessel, monitoring the process, and doing and observing confined space
> entry of coagulation vessels for cleaning purposes.[23]

On September 21, 1997, plaintiff was promoted to the position F-1 Finishing

Team Leader due to her past experience as an F-1 Finishing Operator.[24]  The Team

Leader position is described as a "nonsupervisory working lead," which means that,

in addition to performing the duties of an Operator, a Team Leader also is responsible

for "prioritizing assignments for area operators, securing necessary resources, training

new operators, ensuring team member safety, and handling problems during the

shift."[25]   Whenever a Team Leader works on the night shift, she has added

responsibility because no Area Supervisor is on duty during that shift.[26]  Plaintiff

remained in the Team Leader position until DAI terminated her employment on

September 25, 2001.[27]

Plaintiff consistently received favorable performance reviews and pay increases

---

[23]  *Id.* at ¶ 6.

[24]  *Id.* at ¶ 7.

[25]  *Id.*

[26]  Wynn Deposition, at 94.

[27]  Keith Affidavit, at ¶ 7.

during her employment with Daikin.[28]   Until the summer of 2001, plaintiff's personnel file reflected only two disciplinary incidents.  First, on April 10, 2000, plaintiff received a warning letter and was sent home for one day with pay for a safety violation due to her failure to set dryer temperatures at the proper level.[29]  Second, on April 5, 2001, plaintiff received a "Corrective Action" notice, which appears to be a written reprimand, for a safety violation involving steam emitting from pipes at a dangerously high level.[30]

## B.    Employee Complaints and DAI's Investigation

During the summer months of 2001, DAI claims that it began to receive complaints about low employee morale in the F-1 Finishing area.[31]  Specifically, six employees — four white female, one white male, and one African-American female[32] — complained to David Hendrixson, the Production Manger[33] over plaintiff's department,[34] that plaintiff:  used abusive language; made fun of employees in front

---

[28] *See* Keith Affidavit, at Exhibits B & R.

[29] Keith Affidavit, at ¶ 18(a) and Exhibit O.

[30] *Id.* at ¶ 18(b) and Exhibit P.  Plaintiff claims that white male employee Jeff Green actually was responsible for this incident.  *See* § III(B)(1)(c), *infra.*

[31] Keith Affidavit, at ¶ 19; defendant's evidentiary submission, Tab 3 (Affidavit of David Hendrixson), at ¶ 9; plaintiff's evidentiary submission, Tab 4 (Deposition of David Hendrixson), at 35-38, 54-55.

[32] Hendrixson Affidavit, at ¶ 9(c).

[33] Hendrixson Deposition, at 11.  As Production Manager, Hendrixson directly supervises several lower-level supervisors, including plaintiff's direct supervisor.

[34] Hendrixson Affidavit, at ¶¶ 1, 9.

of others; made public, derogatory comments about other employees' performance; and threatened to set up an employee for termination.[35]

Hendrixson discussed these complaints with employees who worked in the F-1 Finishing Area.[36]  Hendrixson and Carter (a white male who was plaintiff's immediate supervisor at the time) met with plaintiff on August 1, 2001, to inform her of the following accusations by other employees: *i.e.,* (1) "People are afraid of you"; (2) "People are intimidated by you"; (3) "You love to delegate instead of doing the actual job"; (4) "If Portia doesn't like you, you won't be hired"; (5) "You are always in the middle of something"; (6) "You curse excessively sometimes"; and, (7) "You like the night shift better than the day shift."[37]  Plaintiff had not previously been informed of any of these complaints.[38]  Plaintiff denied the allegations, and states that she left the meeting with Hendrixson and Carter thinking the matter had been resolved.[39]

Hendrixson subsequently reported the concerns over low morale in the F-1 Finishing Area to Forrest Keith, the Human Resources Manager.  Keith investigated

---

[35] *Id.* at ¶¶ 9(a)-(b).  Plaintiff denies that she engaged in any of the referenced behavior. *See* doc. no. 13 (plaintiff's brief), at xviii (plaintiff's response to defendant's statement of facts). However, she does not deny that Hendrixson received oral complaints about this behavior, nor does she produce any evidence that such complaints were not made.

[36] Hendrixson Affidavit, at ¶ 9.

[37] *Id.* at ¶¶ 35-37.

[38] *Id.* at ¶ 38.

[39] *Id.* at ¶ 39.

the situation, including the complaints about plaintiff's behavior.[40]  Keith states that

he follows a regular procedure when he investigates employee complaints.  He

interviews operators in the area from which the complaints originated, and he makes

notes of his interviews, summarizing the employees' comments.  He often requires

the interviewees to sign written statements, but he sometimes chooses not to do so if

the complaining employees are fearful of the accused employee.  On the occasions

when Keith does not require a signed statement, he relies on his written notes.

Further, Keith states that, when determining the credibility of a complaint, he

considers the consistency of all statements he receives, including statements from

complaining employees, other witnesses, and the accused employee.[41]

Keith states he has followed this procedure in the past when investigating a

Team Leader's behavior.  In December of 2000, DAI received a complaint that Team

Leader Dana Marchand, a white female who had a good performance history and no

prior disciplinary record, referred to a coworker as a "black bitch."[42]   Keith

subsequently interviewed the operators in Marchand's work area, and he took notes

of the interviews.  He did not interview non-DAI employees who were contracting

to work at DAI, and he did not ask employees to sign written statements because

---

[40]  *Id.* at ¶ 10.

[41]  Keith Affidavit, at ¶ 14.

[42]  *Id.* at ¶ 15.

some employees expressed fear of Marchand.[43]  Following the investigation, Keith

determined Marchand was guilty of using the term "black bitch," and he consequently

terminated her employment.[44]

Keith states he followed a similar process when investigating the complaints

about plaintiff in September of 2001.  He interviewed employees in plaintiff's work

area, and he took notes of his interviews instead of requiring signed statements,

because some employees had expressed fear of plaintiff.[45]  The interviews revealed

additional allegations against plaintiff, including that she:  used a cellular telephone

in the plant; slept on the job; brought food and/or soft drinks into the "clean room,"

where such products were not allowed; and altered other employees' paperwork to

make it appear that they had engaged in misconduct.[46]

---

[43] *Id.* at ¶ 16.

[44] *Id.* at ¶ 17.

[45] *Id.* at ¶ 20(c).

[46] *Id.* at ¶ 19(b).  Several DAI employees subsequently executed affidavits recounting various aspects of plaintiff's behavior they had witnessed.  *See* defendant's evidentiary submission, Tab 7 (Affidavit of Hillary Coffey) (stating that plaintiff used profanity, brought soft drinks into the "clean room," showed favoritism, closed her eyes while at work, and used her cellular phone at work); *id.* at Tab 8 (Affidavit of Brad Etheridge) (plaintiff spoke abusively to operators and used her cellular phone at work); *id.* at Tab 9 (Affidavit of Jeff Greene) (plaintiff spoke abusively to operators, tried to get employees in trouble for things they did not do, slept on the job on multiple occasions, used her cellular phone at work, was inaccessible during her shift, and brought food and drinks into the "clean room"); *id.* at Tab 11 (Affidavit of Wendy Heflin) (plaintiff spoke abusively to operators, slept on the job on multiple occasions, altered paperwork, used her cellular phone at work, and brought drinks into the "clean room"); *id.* at Tab 13 (Affidavit of Melody Hill) (plaintiff spoke abusively to operators, used her cellular phone in the process area, brought drinks into the process area, and was unavailable to operators during her shift); *id.* at Tab 14 (Affidavit of Lynne Holmes) (plaintiff spoke abusively to operators, tried to get employees in trouble for things they did not do,

-11-

Keith interviewed plaintiff, with Hendrixson present, during the course of his investigation.[47]   Keith and Hendrixson asked plaintiff generalized questions, including the following:

a.    Why was the department unhappy?
b.    Are you intimidated by anyone in the department?
c.    Is anyone in the department talking on a cellular telephone?
d.    Is anyone in the department sleeping on the job?
e.    Is anyone in the department refusing to work another shift?
f.    Are any of the Team Leaders failing to get along?
g.    Is anyone cursing or using loud language?
h.    Are there any cliques in the department?
i.    Any favoritism being shown [sic]?[48]

Plaintiff responded that she was unaware of any problems with Team Leaders sleeping on the job or talking on cellular telephones, although she did state that

---

slept on the job, and used her cellular phone in the process area); *id.* at Tab 15 (Affidavit of Dinah Holt) (plaintiff spoke abusively to operators, abandoned her shift, used her cellular phone at work, and brought drinks into the "clean room"); *id.* at Tab 16 (Affidavit of Christy Hutto) (plaintiff used her cellular phone in the smoking room); *id.* at Tab 17 (Affidavit of Linda Johnson) (plaintiff spoke abusively to operators, spent too much time in the smoking room, used her cellular phone in the process area, and brought drinks into the "clean room"); *id.* at Tab 18 (Affidavit of Jeremy Latham) (plaintiff talked about other operators behind their backs, was unavailable during the shift, used her cellular phone at work, and brought drinks into the "clean room"); *id.* at Tab 19 (Affidavit of Ginger Letson) (plaintiff spoke abusively to operators, used her cellular phone in the break room, and brought drinks into the "clean room"); *id.* at Tab 20 (Affidavit of Jennifer Lindsey) (plaintiff spoke abusively to operators and used her cellular phone in the process area); *id.* at Tab 22 (Affidavit of Ronnie Morgan) (plaintiff spoke abusively to operators, altered paperwork, brought drinks into the "clean room," slept on the job, and used her cellular phone at work); *id.* at Tab 23 (Affidavit of Audrey White) (plaintiff was verbally abusive to other operators, showed favoritism, used her cellular phone at work, and brought drinks into the "clean room"); *id.* at Tab 25 (Affidavit of Brad Wallace) (plaintiff used her cellular phone in the break room).

[47] Wynn Affidavit, at ¶ 45.

[48] *Id.* at ¶ 46.

everyone in her processing area owned such devices.[49]  When plaintiff commented on problems with white coworkers, Keith told Hendrixson not to write down the comments.[50] Keith and Hendrixson did not specifically ask plaintiff whether *she* slept on the job, used her cellular telephone in the process area, or personally committed any of the other alleged offenses.[51]

## C.   Termination Decision

Following his investigation, Keith concluded plaintiff had committed the acts of which she was accused.  Keith stated he believed the accusing employees because their accounts were consistent and corroborative.  He also considered plaintiff's Team Leader position and the responsibilities it encompassed, plaintiff's prior performance and disciplinary record, and the severity of each of the offenses of which plaintiff was accused.[52]  He concluded that the offenses plaintiff committed — harassing other employees, using a cellular telephone which had not been certified by OSHA as "intrinsically safe" while in the plant, sleeping on the job, and bringing food and drinks into the "clean room" — were sufficiently severe to warrant strict discipline.[53]

---

[49] *Id.* at ¶ 47.

[50] *Id.*

[51]  Wynn Deposition, at 143-144

[52] Keith Affidavit, at ¶ 21; plaintiff's evidentiary submission, Tab A (Deposition of Forrest Keith), at 39.

[53] Keith Affidavit, at ¶ 21; Keith Deposition, at 39.

Accordingly, he terminated plaintiff's employment on September 25, 2001.  The
stated reason for the termination decision was a "violation of company policy."[54]
Jeremy Latham, a white male, replaced plaintiff as Team Leader following her
termination.[55]

## D.   Plaintiff's Unemployment Compensation Application

Following her termination, plaintiff applied for unemployment compensation
benefits.  On a "Notice of Claim and Request for Separation Information" form
submitted to the Unemployment Compensation Division of the Alabama Department
of Industrial Relations, Forrest Keith indicated that the reason for plaintiff's
termination was "violation of company policy."[56]  DAI did not elaborate further on
the events leading to plaintiff's termination, despite the Unemployment
Compensation Agency's directive to avoid "general terms such as . . . violation of
company policy."[57]  In November of 2001, the Unemployment Compensation Agency
sent notice that plaintiff had been found eligible to receive unemployment benefits.[58]

---

[54] Keith Affidavit, Exhibit B, at document bearing Bates Stamp Number "Keith AFF
000010."

[55] Plaintiff's evidentiary submission, Tab M (defendant's response to plaintiff's
interrogatories), at ¶ 5.  Latham submitted an affidavit stating that plaintiff was inaccessible,
harassed other employees, used her cellular phone in the plant's work area, and brought food and
drink into the clean room.  *See* defendant's evidentiary submission, Tab 18 (Affidavit of Jeremy
Latham).

[56] Plaintiff's evidentiary submission, Tab C.

[57] *Id.*

[58] Plaintiff's evidentiary submission, Tab B.

-14-

There is no indication that a hearing was held on plaintiff's claim for benefits.  There also is no indication that DAI appealed from the award of benefits.

## III.  DISCUSSION

Plaintiff claims she was terminated because of her race, in violation of 42 U.S.C. § 1981, and that she was subjected to a racially hostile work environment.[59]

## A.    Hostile Work Environment

At the summary judgment stage, plaintiff has effectively abandoned her hostile work environment claim.  She offered no response to defendant's well-supported arguments that summary judgment should be granted on that claim.  Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman v. AI Transport,* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for

---

[59] *See* doc. no. 1 (Complaint).

summary judgment is to be treated by the district court as abandoned)).  Further, the court finds plaintiff has presented no evidence to support a claim for a racially hostile work environment.  Accordingly, summary judgment will be entered on plaintiff's hostile work environment claim.

## B.    Termination

Plaintiff acknowledges that she does not have direct evidence to support her discriminatory termination claim.[60]   Thus, she must prove her claim with circumstantial evidence, navigating the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  Under this analysis, a plaintiff must first establish a prima facie case of disparate treatment, which creates a presumption of discrimination.  To rebut the presumption, the employer then must articulate a legitimate, nondiscriminatory reason for the disputed employment action. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that defendant's proffered reason is merely a pretext for unlawful discrimination.  *See McDonnell Douglas,* 411 U.S. at 802-05; *Burdine,* 450 U.S. at 252-56.[61]

---

[60] *See* doc. no. 9 (plaintiff's brief), at xxiv, ¶ 24 ("Wynn only admits that, as with most discrimination cases, she has no direct evidence."); *see also id.* at 2 ("The plaintiff will prove her case with circumstantial evidence . . . .").

[61] It is clear that the *McDonnell Douglas* framework applies to plaintiff's Section 1981 claim.

### 1.    Prima facie case

To establish a prima facie case of race-based discrimination in the termination of employment, plaintiff "must . . . show that (1) [she] is a member of a protected class; (2) [she] suffered an adverse employment action; (3) [her] employer treated similarly situated employees outside of the protected class more favorably; and (4) [she] was qualified to do the job." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 802; *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001)); *see also*, *e.g.*, *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).[62]

---

*See, e.g., Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (applying *McDonnell Douglas* analytical framework to claims under 42 U.S.C. § 1981); *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060 (11th Cir. 1994) ("The *McDonnell Douglas* scheme for the allocation of burdens and the order of presentation of proof also applies in § 1981 cases involving discriminatory treatment in employment situations.").

Further, plaintiff's Section 1981 claim must be analyzed in the same manner as a race discrimination claim brought pursuant to Title VII of the Civil Rights Act of 1964. *See Bass v. Board of County Commissioners*, 256 F.3d 1095, 1109 n.4 (11th Cir. 2001) (quoting *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000) ("The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context.").

[62] Plaintiff asserts she can establish a prima facie case because she can demonstrate that she: (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position from which she was terminated; and, (4) was replaced by a person — Jeremy Latham, a white male — outside her protected class. *See* plaintiff's brief, at 3-5. The court recognizes that the Eleventh Circuit has, in some instances, employed this articulation of the prima facie case in a termination claim. *See, e.g., Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir. 1984); *Whiting v. Jackson State University,* 616 F.2d 116, 121 (5th Cir. 1980). However, the court could locate no case in which the Eleventh Circuit employed this formulation of the prima facie case in a discrimination case based on discharge *for violation of policy or work rules*.

It is undisputed that plaintiff, an African American, is a member of a class of persons protected by 42 U.S.C. § 1981. The termination of her employment clearly was an adverse employment action. *See Llampallas v. Mini-Circuits Lab, Inc.,* 163 F.3d 1236, 1246 n.18 (11th Cir. 1998) (stating that termination is the "classic and ultimate 'tangible employment action'"). Further, plaintiff was qualified to perform the duties of her job. In termination cases — as contrasted to cases involving an employer's failure to hire or promote — the question of whether a plaintiff was qualified to perform the duties of her job often is not an issue. *See Crapp*, 242 F.3d at 1020. The Eleventh Circuit has recognized that, "in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred." *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987); *see also Pace v. Southern Railway Sys.*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983). Here, plaintiff's qualification for her position can be inferred, because she was employed by DAI for eight years with a good performance record, serving as an F-1 Finishing Operator from 1993 to 1997, and as F-1 Finishing Team Leader from 1997 to 2001.

However, plaintiff cannot prove the third element of her prima facie case: *i.e.,* that defendant treated similarly-situated, non-racial-minority employees more favorably than she was treated. The following is a concise summary of the Eleventh

Circuit's guidance on what is required to show that two employees are similarly situated:

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).  "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."  *Id.* (internal quotations and citations omitted).  *We require that the quantity and quality of the comparator's misconduct be nearly identical* to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.  *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

*Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (emphasis supplied).

Thus, plaintiff must show that employees outside her protected class (non-African Americans) were found guilty of the same or "nearly identical" misconduct, yet were disciplined in different ways.  *Id.*; *see also, e.g., Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001) ("The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed.").  "Absent some other similarly situated but differently disciplined worker, there can be no disparate treatment." *Abel v. Dubberly,* 210 F.3d 1334, 1339 (11th Cir. 2000).

-19-

Where there are clear differences in either the *quantity* or *quality* of the acts of misconduct committed by the plaintiff and her alleged comparators, it cannot be said that they are "nearly identical." *See Silvera*, 244 F.3d at 1259 ("[A]lthough Silvera and Ritter have in common the fact that they were arrested in the 1970's . . . Silvera has three additional arrests . . . . The fact that Silvera had multiple arrests is by itself sufficient to establish that he is not similarly situated to Ritter."); *Maniccia*, 171 F.3d at 1368-69 (holding that a female plaintiff in a Title VII sex discrimination case was not similarly situated to male employees who each committed a single policy violation, whereas the female plaintiff had committed at least four policy violations); *Jones*, 137 F.3d at 1312-13 (holding that employees who allegedly committed one act of misconduct were not similarly situated to the plaintiff, who engaged in multiple instances of misconduct in the same day).

Plaintiff identifies three individuals as alleged comparators: *i.e.,* Amanda Campbell, Lynn Holmes, and Jeff Green. The court concludes that these individuals are not sufficiently "similarly situated" to plaintiff to satisfy a prima facie case.

### a.    Amanda Campbell

Plaintiff asserts that Amanda Campbell, a white female employee retained by DAI, "does nothing for eight hours, but talk *on the phone* to hubby all day [sic]."[63]

_____

[63] Defendant's evidentiary submission, Tab 4 (Wynn Deposition), defendant's exhibit 14, at document bearing Bates Stamp No. PDEP 000127 (emphasis supplied).

This alleged misconduct is not "nearly identical" to that for which plaintiff was discharged.   First, Ms. Campbell's alleged conduct differs *qualitatively* from plaintiff's.  There is no indication, or even any allegation, that Ms. Campbell used a *cellular* telephone in her work area.  Neither plaintiff nor DAI has produced evidence that use of a telephone, other than a cellular telephone, is prohibited by DAI policy. Ms. Campbell's alleged conduct also differs *quantitatively* from plaintiff's.  Even if plaintiff's allegations are true, and even if use of a regular telephone in the workplace *is* prohibited by DAI, Ms. Campbell still violated only a *single* DAI policy.  Plaintiff, on the other hand, was terminated for violating *multiple* DAI policies.[64]

### b.    Lynn Holmes

Plaintiff asserts that Lynn Holmes, a white female Team Leader retained by DAI, was found "cooking sometimes for 12 hours when all other teamleader [sic] were doing a process or sometimes running two processes."[65]  Plaintiff asserts that Ms. Holmes is similarly situated in the following manner:  plaintiff was accused of

---

[64] In addition, plaintiff does not offer any sworn testimony supporting Ms. Campbell's alleged telephone use.  Instead, plaintiff relies on an attachment to a letter that she wrote to DAI's corporate office, outlining her responses to questions asked by Keith and Hendrixson during their interview of her.  *See id.*  She did not mention any alleged comparators in her deposition *or* her affidavit.

[65] Defendant's evidentiary submission, Tab 4 (Wynn Deposition), defendant's exhibit 14, at documents bearing Bates Stamp Nos. PDEP 000118 and PDEP 000127.  Although it is less than clear from the parties' submissions, "cooking" apparently is an isolated step in the manufacturing process.  Plaintiff seems to be accusing Ms. Holmes of spending too much time focusing on this isolated task, while she should have instead been performing a variety of production tasks.

not being able to perform her job duties because she spent time sleeping and using her cell phone at work, and Ms. Holmes was unable to perform other job duties because she spent too much time "cooking." The court disagrees. First, plaintiff's situation is *qualitatively* different from that of Ms. Holmes, because plaintiff allegedly violated specific workplace rules and policies, including safety regulations. In contrast, Ms. Holmes is not accused of breaking any rules. Instead, she apparently was carrying out a function of her job; she simply focused too much time on one specific work task. There also is a *quantitative* difference. Ms. Holmes is accused of engaging in a single type of misconduct: *i.e.,* spending too much time "cooking" during her shift. In contrast, plaintiff allegedly engaged in *multiple* policy violations, including sleeping on the job, using a cellular telephone on the job site in violation of company policy, bringing food and drink into the "clean room," and harassing and abusing coworkers.[66]

### c.    Jeff Green

Finally, plaintiff asserts that Jeff Green, a white male employee retained by DAI, committed a safety violation by leaving a steam valve completely open, an oversight which could have caused severe burns to any person who turned on the

---

[66] Plaintiff offers no deposition or affidavit testimony to establish Ms. Holmes' practice of "cooking." *See supra,* note 64.

water running through that valve.[67]   Plaintiff reported this incident to Jason Carter,

the relevant supervisor, but Carter did not take disciplinary action against Green.

Instead, *plaintiff* received written discipline for the incident.[68]

Green cannot be considered a "similarly situated" comparator.  Although his

alleged misconduct — a safety violation — is qualitatively similar to *one* of

plaintiff's alleged policy violations, there is a significant *quantitative* discrepancy

between Green's alleged actions and plaintiff's.  Plaintiff alternatively reports that

Mr. Greene left the steam valve open on a single occasion,[69] and that he did so on

multiple occasions.[70]   Even if Mr. Greene did commit this safety violation on a

number of occasions, he still only committed a single *type* of safety violation.

Plaintiff, on the other hand, was accused of several types of policy violations, most

of which allegedly occurred on multiple occasions.  Therefore, Jeff Greene is not

---

[67] *See* Wynn Affidavit, at ¶ 16; defendant's evidentiary submission, Tab 4 (Wynn Deposition), defendant's exhibit 14, at document bearing Bates Stamp No. PDEP 000118.  Plaintiff states in her affidavit that an unidentified white male was responsible for leaving the steam valve open. *See* Wynn Affidavit, at ¶ 16.  She identifies that individual as Jeff Green in the attachment to the letter she wrote to DAI corporate headquarters following her termination.  *See* defendant's evidentiary submission, Tab 4 (Wynn Deposition), defendant's exhibit 14, at documents bearing Bates Stamp No. PDEP 000118.

[68] Keith Affidavit, at ¶ 18(b) and Attachment P.  It is important to note that plaintiff is not challenging the disciplinary action she received as a result of this incident.  This incident is one of the two on plaintiff's disciplinary record prior to the 2001 investigations at issue here.  *See* § I(C), *supra.*

[69] Wynn Affidavit, at ¶¶ 16-20.

[70] Defendant's evidentiary submission, Tab 4 (Wynn Deposition), defendant's exhibit 14, at documents bearing Bates Stamp No. PDEP 000118 (plaintiff complained about "Jeff Green, senior operator [sic] leaving valves open constantly").

-23-

"nearly identical" to plaintiff.[71]

In summary, plaintiff has failed to produce any evidence that a similarly situated white employee was retained despite engaging in policy violations similar to those for which plaintiff's employment was terminated.[72]  Thus, plaintiff has failed to establish a prima facie case of race discrimination, and her discrimination claim fails as a matter of law.  *See Walker v. Mortham,* 158 F.3d 1177, 1193 (11th Cir. 1998) (holding that a plaintiff "cannot succeed in proving that she was intentionally discriminated against if she does not establish a prima facie case of discrimination").[73]

## C.    Motion to Strike

Defendant moved to strike various portions of plaintiff's evidentiary submission.  The court concludes that, even considering those portions of plaintiff's

---

[71] Plaintiff also asserts that everyone in the F-1 Finishing Department had cell phones, and that "several operators" used their cell phones in the plant.  *See* plaintiff's brief, at 20.  This contention is irrelevant, because plaintiff does not identify the race of the employees who used cell phones.  Specifically, she does not state that any of these employees are non-minorities.

[72] Indeed, as defendant points out, it has offered evidence of white employees who were discharged for engaging in a single policy violation.  For example, Dana Marchand, a white female, was terminated for using the term "black bitch."  *See, e.g.,* Hendrixson Affidavit, at ¶ 13(a)(1).  Jamie McMeans, a white male, and Joanne McNeal, a white female, both were terminated for engaging in a single safety violation.  *See id.* at ¶ 13(a)(2).

[73] Because plaintiff has failed to establish a prima facie case of race discrimination, the court need consider neither the sufficiency of defendant's proffered legitimate, nondiscriminatory reasons for plaintiff's discharge, nor plaintiff's argument that those proffered reasons are a mere pretext for race discrimination.  Further, because defendant's proffered legitimate, non-discriminatory reasons are not part of the analysis, the court also need not consider plaintiff's argument that the doctrine of collateral estoppel, or issue preclusion, prevents defendant from asserting that plaintiff was fired for a violation of company policy.  *See* plaintiff's brief, at 6-8.

evidence encompassed by defendant's motion to strike, summary judgment is due to be granted, for the reasons stated above.  Accordingly, the motion to strike is due to be denied as moot.

## IV.  CONCLUSION

In accordance with the foregoing, defendant's motion to strike is due to be denied as moot.  Defendant's motion for summary judgment is due to be granted.  All claims of plaintiff are due to be dismissed with prejudice.  An appropriate order will be entered.

DONE this 25th day of October, 2005.

_____
United States District Judge